UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| TRAVIS ARMES, GREGORY LEE ADKISSON, JEREMIAH NORMAN, GARY MITCHEL DAVIS, and TRAVIS L. CONLON, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:05-CV-459 (Shirley) |
| MICHAEL WREN, Deputy for the Morgan County, Tennessee Sheriff's Department, ROBERT GIBSON, Sheriff of Morgan County, Tennessee, INDIVIDUALLY and in their OFFICIAL CAPACITIES, and MORGAN COUNTY, TENNESSEE, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 13]. The Court conducted a non-jury trial in this matter on February 6, 2007.

**I.    Introduction**

This is a civil action brought pursuant to 42 U.S.C. § 1983 by the plaintiffs Travis Armes, Gregory Lee Adkisson, Jeremiah Norman, Gary Mitchell Davis, and Travis L. Conlon against the defendants Michael Wren, Robert Gibson, and Morgan County, Tennessee. At the time

of the incident which gave rise to this litigation, defendant Wren was a deputy with the Morgan County Sheriff's Department, and Robert Gibson was the Sheriff of Morgan County. The plaintiffs allege that they were arrested without probable cause and subjected to cruel and unusual punishment in violation of their constitutional rights. They assert that the County is liable for failing to properly train and supervise Deputy Wren. Additionally, the plaintiffs assert state law claims for false arrest and outrageous conduct.

## II.     Plaintiffs' Constitutional Claims

### A.     Arrest Without Probable Cause

The plaintiffs allege that the defendants violated their Fourth Amendment rights to be free from arrest without probable cause. Probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent or reasonable person "in believing, under the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." Thacker v. City of Columbus, 328 F.3d 244, 255 (6th Cir. 2003). "The probability of criminal activity is assessed under a reasonableness standard based on 'an examination of all facts and circumstances within an officer's knowledge at the time of the arrest.'" Crockett v. Cumberland College, 316 F.3d 571, 580 (6th Cir. 2003) (quoting Estate of Dietrich v. Burrows, 167 F.3d 1007, 1012 (6th Cir. 1999)). The probable cause determination may be based on the collective knowledge of the officers. United States v. Perkins, 994 F.2d 1184, 1189 (6th Cir. 1993).

While the parties did not proffer a summary of the facts testified to at trial, the Court's notes reveal that the testimony introduced at trial established the following facts. Plaintiff Travis Armes testified that he arrived at his home from working out of state at about 12:30 a.m. on

September 25, 2004. He was informed by his friends, who were in his garage working on a race car, that officers had already been there on a noise complaint. Plaintiff Gregory Adkisson testified that there were approximately 18 people present at the Armes residence on the night of the plaintiffs' arrest. Adkisson testified that he and some of the other plaintiffs were working on the race car in Armes's garage, and there was alcohol being consumed. Adkisson admitted that the stereo in his car, which was parked outside of the garage, was playing music. When the officers first arrived at the residence, they told him to turn the music off, and he complied. Adkisson testified that he continued to work on the race car in the garage with the garage door open.

Armes testified that there was no noise when he arrived home. Armes testified that minutes after he arrived, officers returned to the property and told the plaintiffs and others present to go into the garage and shut the garage door. Armes and the others complied, but Armes raised the garage door again to go inside his house to get some clothes. He testified that the officers were driving by at that moment, saw him open the door, and arrested the plaintiffs. Armes denied that he was drinking or participating in any loud activity when he was arrested. He testified that none of the other plaintiffs were "acting out of line" at the time of their arrest.

Plaintiffs Jeremiah Norman, Gary Davis, and Travis Conlon testified consistently with Armes and Adkisson. While the plaintiffs conceded that there was drinking, talking, and music playing prior to the officers first arriving on the scene, all of the plaintiffs denied making loud noises or playing music after the officers' initial visit to the Armes residence. The plaintiffs also presented the testimony of two of Armes's neighbors, Tamara Hensley and Mark Turner, who both testified that they did not hear any loud noises that evening.

Kevin Heidel, dispatcher for the Morgan County Sheriff's Department, testified that he received a call on September 25, 2004 at 12:28 a.m. from Sonia Keathly, who complained of "lots of noise" coming from the house next door, which she identified as the residence of the plaintiff Travis Armes.[1]  Ms. Keathly stated that her child was having difficulty sleeping due to the noise. Heidel testified that officers were dispatched at 12:28 a.m. and arrived on the scene at 12:31 a.m.

Officer Jason Williams was one of the officers dispatched to the Armes residence. He testified that when he and the other officers arrived, he saw sixteen to twenty people, including the plaintiffs, in the front yard, and that there were numerous cars parked on the street. He testified that loud music was playing from the garage. He observed bottles of alcohol but did not see anyone drinking. He testified that the plaintiffs and the other partygoers were told to stay quiet and to keep the garage door closed. The plaintiffs complied with the officers' request, and the officers left. By the time Officer Williams returned to his car, however, he testified that the music had started up again. The officers returned to the scene and asked them to keep the noise level down. They also checked identifications and instructed those who were underage to leave. After this second visit, Officer Williams testified that he drove to a church parking lot about 200 to 300 yards down the street, and within a few minutes, heard loud music again. The officers returned to the property and told the plaintiffs to quiet down. Officer Williams testified that the officers again left, but as they were driving down the street, loud noises were again heard from the residence. When the officers returned to the residence for the fourth and final time, the plaintiffs were arrested.

Deputy Wren testified that when he arrived on the scene, the other officers had already been to the residence twice that evening due to loud noise. On his first visit to the scene,

---

[1]The recording of this call was entered into evidence as Exhibit 12.

Wren spoke with Travis Armes and advised him to keep the noise level down. While Wren testified that he could not hear any music on his second visit, he did hear loud talking and yelling. He testified that at that point, he entered the garage and arrested the plaintiffs.

Other witnesses called by the defense, including reserve officers Rick Ausburn, Allen Dagley, and Steve Melhorn, confirmed the testimony of Williams and Wren. Ausburn testified that he observed several people outside of the garage drinking alcohol when the officers first arrived. He testified that after telling the plaintiffs and the others to quiet down, he and the other officers went to the church parking lot nearby and could still hear music and yelling coming from the Armes residence. Ausburn further testified that on the officers' third visit (this time accompanied by Deputy Wren), the plaintiffs closed the garage door, but as the officers were leaving, someone opened the garage door and began "hollerin'." Dagley characterized this yelling as a "rebel yell." Melhorn also confirmed that alcohol was being consumed. He testified that when the officers went to the church parking lot down the road, they could still hear music and loud noise coming from the Armes residence.

Charles Tanner, a tow truck driver, was also at the scene. His 18-year-old daughter was attending the party, and because he was concerned that she had been drinking, he had come to tow her car. Tanner testified that he met up with the officers at the church parking lot and could hear "hoopin' and hollerin'" and "yee haws" coming from the Armes residence.

The plaintiffs' boisterous behavior continued after their arrest. Ausburn testified that the plaintiffs were laughing, joking, and "cuttin' up" while they were being arrested and taken to jail. Two of the officers who transported the plaintiffs, Steve Melhorn and Chris Templeton, also testified that the plaintiffs were "gigglin' and carryin' on" on their way to jail. Melhorn testified that

5

he could tell that the plaintiffs had been drinking. The intake officer at the Sheriff's Department, Jaime Rupert, testified that the plaintiffs were loud, obnoxious, and "cuttin' up" and had to be told to quiet down during the booking process at the jail.

Upon review of the testimony presented at trial, the Court finds that the facts known to the officers at the time of the plaintiffs' arrest were sufficient to warrant a reasonable person in believing that the plaintiffs had committed the offense of disorderly conduct. Under Tennessee law, the offense of disorderly conduct is defined as follows:

> (a) A person commits an offense who, in a public place and with intent to cause public annoyance or alarm:
>
> (1) Engages in fighting or in violent or threatening behavior;
> (2) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency; or
> (3) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.
>
> (b) A person also violates this section *who makes unreasonable noise that prevents other from carrying on lawful activities*.
>
> (c) A violation of this section is a Class C misdemeanor.

Tenn. Code Ann. § 39-17-305 (emphasis added). In the present case, the Morgan County Sheriff's Department received a call from someone identifying herself as Sonya Keathly who reported that there was loud noise coming from the Armes residence, which was preventing her daughter from sleeping. This dispatch call gave the officers probable cause to believe that someone at the residence of Travis Armes was "mak[ing] unreasonable noise that prevent[ed] others from carrying on lawful activities." See Tenn. Code Ann. § 39-17-305(b). Once the officers arrived on the scene,

the officers personally observed loud noises, including music and yelling, coming from the Armes residence. The Court finds that despite being told to quiet down, the plaintiffs continued to make loud noise. In this regard, the Court credits the testimony of the officers who testified that they heard yelling, music, and other loud noises coming from the Armes residence after their initial visit there. The Court also specifically credits the testimony of Charles Tanner, a disinterested third party, who testified that he too heard loud noises coming from the Armes residence while in the church parking lot. Based upon this evidence, the Court finds that there was probable cause to arrest the plaintiffs for disorderly conduct, and accordingly, their Fourth Amendment claim must fail.

The plaintiffs argue that there was no evidence that the call to the Morgan County Sheriff's Department was in fact made by Sonya Keathly. They also argue that there was evidence that Ms. Keathly refused to appear and testify at the hearing in this matter at the General Sessions level. Neither of these arguments, however, militates against a finding of probable cause. The officers received information from dispatch indicating that Ms. Keathly, who identified herself as a neighbor of Travis Armes, complained of loud noises coming from the Armes residence. Based upon this information, the officers were justified in going to the Armes residence and investigating the complaint, regardless of whether the identify of the caller was independently verified. Upon being dispatched, the officers corroborated Ms. Keathly's complaint of loud noise and disorderly conduct. The proof at trial establishes that there was a loud party going on at the Armes residence in the wee hours of the morning, and that this partying was causing a disturbance. The officers personally observed drinking, loud talking, and loud music being played from outside of the garage when they arrived. After being told repeatedly to quiet down and stay inside the garage, the

7

plaintiffs continued to make loud noise, which several witnesses testified could be heard down the street.

The fact that Ms. Keathly failed to appear at the subsequent hearing and apparently refused to prosecute the charges against the plaintiffs also does not affect the probable cause analysis. Probable cause must be assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Kostrzewa v. City of Troy, 247 F.3d 633, 639 (6th Cir. 2001). For the reasons set forth above, the Court finds that the officers had probable cause to arrest the plaintiffs for disorderly conduct.[2] The fact that the charges were later dropped due to the complainant's failure to prosecute does not change the fact that the officers had probable cause at the time of the plaintiffs' arrest.

The defendants argue that another independent basis for finding the plaintiffs' arrests lawful is the fact that each plaintiff admitted that he was arrested lawfully. The defendants submitted a set of Requests for Admission to each plaintiff through counsel on April 12, 2006. Plaintiffs' counsel responded to these Requests for Admission, albeit untimely, on June 5, 2006. Each plaintiff admitted that he "was arrested lawfully on September 25, 2004." Moreover, each plaintiff confirmed his admission at trial. Under Rule 36(b) of the Federal Rules of Civil Procedure, "[a]ny matter admitted under [Rule 36] is *conclusively established* . . . ." Fed. R. Civ. P. 36(b) (emphasis added); T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co., 174 F.R.D. 38, 44 (S.D.N.Y. 1999) ("Rule 36 responses become, in effect, sworn evidence that is binding upon the respondent at trial."). If not withdrawn or amended, admissions "cannot be rebutted by contrary

---

[2]Furthermore, the Court notes that there was testimony at trial to indicate that the reason Ms. Keathly failed to appear and prosecute the charges was that she was being harassed and pressured not to pursue the charges by some of the plaintiffs' family members.

8

testimony or ignored by the [Court] simply because it finds the evidence presented by the party against whom the admission operates more credible." Switchmusic.com, Inc. v. U.S. Music Corp., 416 F. Supp. 2d 812, 817 (C.D. Cal. 2006) (quoting Cook v. Allstate Ins. Co., 337 F. Supp. 2d 1206, 1210 (C.D. Cal. 2004)).

The Court, *on motion*, may permit withdrawal or amendment of the admission. Fed. R. Civ. P. 36(b). In this matter, plaintiffs' counsel did not object to or petition the Court for withdrawal or amendment of the admissions regarding the lawfulness of the arrests prior to the trial, at the trial, or even after the defendants presented the admissions during each of the five plaintiffs' testimony. Instead, when the defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50 at the close of the plaintiffs' proof, the plaintiffs' counsel stated that the admissions were a "typographical error." The plaintiffs argue in their proposed findings of fact and conclusions of law that counsel was clearly requesting a withdrawal of these admissions when he pointed out that these admissions were a typographical error. The Court disagrees that counsel's intent was so clear. Indeed, counsel never moved to amend or withdraw these admissions until requesting to do so in the plaintiffs' proposed findings of fact and conclusions of law submitted a month after the conclusion of the trial.

The parties have placed the Court in a difficult position. On the one hand, these admissions are clearly binding and have preclusive effect on the issue of whether the plaintiffs were lawfully arrested. To dismiss the plaintiffs' admissions as mere "typographical errors" is to completely ignore, and indeed undermine, the purpose and function of the request for admission. If in fact these admissions were made in error, they were a gross error on the part of counsel and the plaintiffs alike, and given the critical nature of the subject matter of the requests, to allow these

9

admissions – if in fact they are not true – to be signed and served on opposing counsel, borders on inexcusable. On the other hand, the defendants, despite receiving these admissions in June, 2006, did not raise these admissions until trial. If the defendants had truly believed that the plaintiffs had freely admitted that an essential element of their case was non-existent, the Court would have expected the defendants to assert this in a pretrial motion seeking the wholesale dismissal of this case. Given the preclusive effect of such admissions, and absent amendment or withdrawal, such a motion likely would have been found to be well-taken. Granted, had this issue been raised by motion instead of sprung on the plaintiffs at trial, it is likely that the plaintiffs' counsel, realizing this gross error (assuming that the admissions were, as counsel suggests, "errors"), would have moved to amend or withdraw these admissions, and the defendants would have gained no tactical advantage. It is for this reason, the Court suspects, that a motion for summary judgment was not filed earlier; the defendants, seeing an opportunity to exploit an apparent blunder, and not wanting to draw attention to it, chose instead to undergo months of additional discovery and trial preparation and then chose to assert these admissions as a basis for dismissal only after the plaintiffs had presented their case-in-chief at trial. By doing so, the defendants defeated the very purpose of requests for admission – to "safely avoid the expense of proving the very matters on which [they] have] secured the admission." Fed. R. Civ. P. 36, advisory committee's note.

In any event, the trial is now completed, and the Court has found that probable cause did exist to arrest the plaintiffs. As such, the issue of the preclusive effect of these admissions is moot. Thus, while these admissions could have served, and indeed probably should serve, as an additional justification for finding in favor of the defendants, this is not an issue that the Court need decide at this time. The Court, having heard the proof, chooses instead to decide this case on its

merits, and so finds that the plaintiff's Fourth Amendment claims must be dismissed because the proof introduced at trial established that there was probable cause for their arrest.

**B.     Cruel and Unusual Punishment**

In their Complaint [Doc. 1], the plaintiffs assert that they were subjected to cruel and unusual punishment in violation of the Eighth Amendment. In their proposed findings of fact and conclusions of law [Doc. 43], the plaintiffs admit that they did not satisfy their burden on this issue. The Court agrees and finds that there was no evidence presented at trial to suggest that the plaintiffs were subjected to cruel and unusual punishment as a result of their arrest. Accordingly, the Court finds in favor of the defendants with respect to this claim.

**C.     Municipal Liability**

In their Complaint, the plaintiffs allege that Sheriff Gibson failed to properly train and supervise Deputy Wren, thereby causing the plaintiffs "to suffer the embarrassment and humiliation of being falsely arrested and subject to cruel and unusual punishment in violation of those rights protected under the Fourth and Eighth Amendments to the United States Constitution." [Doc. 1].

The Court finds no basis for imposing § 1983 liability upon the County in this case. A finding that a plaintiff has suffered a violation of his constitutional rights by the offending official acting under color of law is a prerequisite to a finding of liability against a municipal defendant. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986). Because the Court finds that the plaintiffs have not established a violation of their rights under the Fourth or Eighth Amendments by Deputy Wren, their claim against Morgan County must also fail. In any event, the plaintiffs presented no evidence regarding Sheriff Gibson's alleged failure to train or supervise the officers upon which

such liability could be imposed. Accordingly, the plaintiffs' claims against Morgan County are dismissed.

### III. Plaintiffs' State Law Claims

#### A. False Arrest

Tennessee law provides that an officer may arrest a person without a warrant "[f]or a public offense committed or a breach of the peace threatened in the officer's presence . . . ." Tenn. Code Ann. § 40-7-103(a)(1). For the reasons stated previously in this opinion, the Court finds that the defendants had probable cause to believe that the plaintiffs had committed the misdemeanor offense of disorderly conduct in the officers' presence by "mak[ing] unreasonable noise that prevent[ed] others from carrying on lawful activities." See Tenn. Code Ann. § 39-17-305(b). Accordingly, to the extent that the plaintiffs assert a claim under state law for false arrest, this claim must also fail.

#### B. Outrageous Conduct

In order to state a claim for outrageous conduct, a plaintiff must show that: "(1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was so outrageous that it cannot be tolerated by civilized society; and (3) the defendant's conduct resulted in serious mental injury to the plaintiff." Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004). It is not enough to show that the defendant acted with tortious or criminal intent; the plaintiff must "show that the defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn. 1999)).

In their proposed findings of fact and conclusions of law [Doc. 43], the plaintiffs concede that they have not satisfied their burden in establishing the legal elements of their outrageous conduct claim. The Court agrees and specifically finds that there is no evidence in the record to support a finding that the defendants engaged in outrageous conduct in this case. Accordingly, this claim is also dismissed.

**IV. Conclusion**

For the foregoing reasons, the Court finds that the plaintiffs' claims under 42 U.S.C. § 1983 and under state law for false arrest and outrageous conduct must be dismissed. An order consistent with these findings of fact and conclusions of law will be entered.

**ORDER TO FOLLOW.**

ENTER:

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge